UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| HELEN WONG, Derivatively on Behalf of Nominal Defendant QUANTUM COMPUTING INC.<br><br>Plaintiff,<br><br>v.<br><br>WILLIAM MCGANN, ROBERT LISCOUSKI, CHRISTOPHER BOEHMLER, CHRISTOPHER ROBERTS, ROBERT FAGENSON, YUPING HUANG, MICHAEL TURMELLE, BERTRAND VELGE, JAVAD SHABANI, and CARL WEIMER<br><br>Defendants,<br><br>and<br><br>QUANTUM COMPUTING INC.,<br><br>Nominal Defendant. | Case No.: 2:25-CV-11952<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT** |

Plaintiff Helen Wong ("Plaintiff"), by and through her undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, Quantum Computing Inc. ("QCI" or the "Company"), against its Board of Directors (the "Board") and certain of its executive officers seeking to remedy Defendants' breaches of fiduciary duties, waste, unjust enrichment, violations of Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and fraud. Plaintiff's

allegations are based upon her personal knowledge as to herself and her own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, including filings by QCI with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and matters of public record.

## I.    NATURE AND SUMMARY OF THE ACTION

1.    QCI is an American company that claims to specialize in the use of non-linear quantum optics to deliver quantum products for high-performance computing applications.

2.    QCI has changed its core business several times since it was founded in 2018. The current core business produces thin film lithium niobate ("TFLN") quantum computing chips.  TFLN chips are primarily used in high-speed optical modulators and quantum photonics.

3.    In September 2023, QCI announced that it had selected a five-acre site at Arizona State University ("ASU") Research Park in Tempe, Arizona (the "ASU Research Park") for a "Quantum Photonic Chip Foundry" to produce TFLN chips, which the Company expected to mass produce by late 2024 to early 2025.

4.    Subsequently, Individual Defendants (defined below) caused QCI to repeatedly tout its business dealings with, *inter alia*, the employee staffing solutions company Quad M Solutions, Inc. ("Quad M"), the purportedly leading artificial

intelligence ("AI") firm, millionways, Inc. ("millionways"), as well as the National Aeronautics and Space Administration ("NASA"). Individual Defendants caused QCI to misrepresent to the public that each such deal, contract, or partnership was the result of QCI's allegedly competitive and differentiable quantum computing technology, products, and services.

5.     Ultimately, Individual Defendants caused the Company to issue numerous misleading statements regarding QCI's business, including: (i) overstatements of the capabilities of QCI's quantum computing technology; (ii) overstatements regarding the scope and nature of QCI's relationship with NASA and related contracts thereto; (iii) misrepresentations of QCI's development of a TFLN foundry at ASU; (iv) the fact that QCI's business with both Quad M and millionways were secretly related party transactions; and, finally, (v) that QCI's meager revenues relied on undisclosed related party transactions.

6.     A series of research reports ultimately revealed QCI's misstatements. First, on November 27, 2024, Iceberg Research ("Iceberg") published a report revealing that QCI had lied about its TFLN foundry at ASU as well as the true status of TFLN orders it had received.

7.     Subsequently, on December 9, 2024, Iceberg published a second report revealing further details undermining QCI's representations regarding its TFLN foundry at ASU, as well as the fact that "[f]rom 2021 to 2024, [QCI] reported

insignificant levels of revenue, despite various claims, such as being a NASA sub-contractor."

8.     On the publication of the second Iceberg report, QCI's stock price fell $0.46 per share, or 5.8%, to close at $7.47 per share on December 9, 2024.

9.     Finally, on January 16, 2025, Capybara Research ("Capybara") published a report revealing that QCI had, *inter alia*: (i) overstated its ties to NASA; (ii) fabricated revenues through multiple related-party transactions; (iii) pushed purportedly fake products; (iv) pumped up its stock price with false and misleading press releases; and (v) never actually purchased the five-acre parcel of land at ASU for its TFLN foundry.

10.    On the publication of the Capybara report, QCI's stock price fell $1.72 per share, or 14.89%, over the following two trading sessions, to close at $9.83 per share on January 17, 2025.

11.    These revelations precipitated the filing of a securities class action in this District against QCI and certain of the Individual Defendants named herein, captioned: *Cohen v. Quantum Computing Inc., et al.*, Case No. 2:25-cv-01457-MEF-JSA (the "Securities Class Action").

12.    Plaintiff did not make a litigation demand prior to filing this action because such action would have been futile based upon the composition of the Board and the actions taken by the Board, as alleged herein.

## II.    JURISDICTION AND VENUE

13.    This Court has original jurisdiction over the claims asserted herein pursuant to 28 U.S.C. § 1332.  Subject matter jurisdiction is proper because the amount in controversy exceeds $75,000, exclusive of interest and cost, and there is complete diversity of citizenship as the named Plaintiff and each of the Defendants are citizens of different states.  This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

14.    This Court additionally has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Exchange Act. This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15.    This Court has personal jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

16.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because: (i) QCI is headquartered in this District; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this jurisdiction; and (iii) the Individual Defendants (defined herein) have received substantial compensation

in this District by doing business here and engaging in numerous activities that have had an effect in this District.

## III.    PARTIES

**Plaintiff**

17.    Plaintiff Helen Wong owned QCI stock during the wrongdoing alleged herein, during all times relevant to this complaint, and continues to own QCI stock. Plaintiff is a citizen of California.

**Nominal Defendant**

18.    Nominal Defendant QCI is a Delaware corporation with principal executive offices located at 5 Marine View Plaza, Suite 214, Hoboken, New Jersey 07030. The Company's common stock is traded on either the Nasdaq Stock Market ("NASDAQ") or the OTC Markets-OTCQB ("OTC") under the ticker symbol "QUBT."

**Defendants**

19.    Defendant **William J. McGann** ("McGann") has served as QCI's Chief Executive Officer ("CEO") since February 1, 2024, before which he served as the Company's Chief Operating Officer ("COO") and Chief Technology Officer ("CTO"). He is a named defendant in the Securities Class Action. Upon information and belief, Defendant McGann is a citizen of Massachusetts.

20.     Defendant **Robert Liscouski** ("Liscouski") served as QCI's CEO until January 31, 2024. He is a named defendant in the Securities Class Action.  Upon information and belief, Defendant Liscouski is a citizen of Virginia.

21.     Defendant **Christopher Boehmler** ("Boehmler") has served as QCI's Chief Financial Officer ("CFO") since July 1, 2023. He is a named defendant in the Securities Class Action.  Upon information and belief, Defendant Boehmler is a citizen of Washington D.C.

22.     Defendant **Christopher Roberts** ("Roberts") served as QCI's CFO until June 30, 2023. He is a named defendant in the Securities Class Action.  Upon information and belief, Defendant Roberts is a citizen of Washington D.C.

23.     Defendant **Robert Fagenson** ("Fagenson") serves at the Vice Chairman of QCI's Board of Directors. Fagenson has been a director of the Company since March 2021 and Vice Chairman since December 10, 2024. Upon information and belief, Defendant Fagenson is a citizen of New York.

24.     Defendant **Yuping Huang** ("Huang") has served as the Company's Chairman of the Board since December 10, 2024. He has been a director of the Company since June 14, 2022. Upon information and belief, Defendant Huang is a citizen of New Jersey.

25.     Defendant **Michael Turmelle** ("Turmelle") has served as a director of the Company since January 2022. Upon information and belief, Defendant Turmelle is a citizen of New Hampshire.

26.     Defendant **Bertrand Velge** ("Velge") served as a director of the Company until November 2023.  Upon information and belief, Defendant Velge is a citizen of England.

27.     Defendant **Javad Shabani** ("Shabani") has served as a director of the Company since April 2024. Upon information and belief, Defendant Shabani is a citizen of New York.

28.     Defendant **Carl Weimer** ("Weimer") has served as a director of the Company since January 2023.  Upon information and belief, Defendant Weimer is a citizen of Colorado.

29.     Collectively, defendants McGann, Liscouski, Boehmler, Roberts, Fagenson, Huang, Turmelle, Velge, Shabani, and Weimer are referred to herein as the "Individual Defendants."

## IV.   DUTIES OF THE INDIVIDUAL DEFENDANTS

30.     By reason of their positions as officers, directors, and/or fiduciaries of QCI and because of their ability to control the business and corporate affairs of QCI, at all relevant times, the Individual Defendants owed QCI and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage QCI in a fair, just, honest, and equitable manner.  The Individual Defendants were required to act in furtherance of the best interests of QCI and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the

Company owes to QCI and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

31.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of QCI, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  Because of their advisory, executive, managerial, and directorial positions with QCI, each of the Individual Defendants had knowledge of material non-public information regarding the Company.

32.    To discharge their duties, the officers and directors of QCI were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company. By virtue of such duties, the officers and directors of QCI were required to, among other things:

      a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

      b.     Exercise good faith to ensure that the Company was operated in a diligent, honest, and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

      c.     Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

   d. When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

## V. SUBSTANTIVE ALLEGATIONS

### A. Background

33. QCI claims to specialize in the use of non-linear quantum optics to deliver quantum products for high-performance computing applications. QCI was founded in 2018.

34. Despite only having existed for seven years, QCI has consistently reinvented itself to correspond with shifts in the technology industry. Indeed, in its brief history, QCI has already shifted its core business *at least* four times; QCI first purportedly focused on quantum-computer-ready software services, then on the commercialization of quantum photonic technology, subsequently on the integration of its technology with AI, and, finally, on the production of TFLN quantum computing chips.

35. Throughout each of these transformations, QCI touted its business performance, taking particular care to underscore its relationships with Quad M, millionways, and its purportedly "long-standing strategic partnership" with NASA. In each instance, QCI tied these relationships to the Company's purportedly unique leveraging of its differentiated quantum computing technologies, products, and/or services.

36.    Despite the Company's bullish representations, doubts began to emerge in the market regarding QCI's business. These doubts first materialized in a 2022 Iceberg Report (the "2022 Report"), which flagged the fact that "[d]emand for [QCI's quantum computing software] Qatalyst has been poor." Sales were not merely poor, they were nonexistent; in fact, according to Iceberg, QCI "report[ed] *zero sales* for the 2018-2021 period." (Emphasis supplied.)

37.    Though Individual Defendant Liscouski "announced that [QCI] would subsidize some early customers in August 2021[,]" "[t]his strategy fell flat as [QCI] booked sales of $96,724 in the first half of [2022], of which ~86% had not been collected at the end of June." The 2022 Iceberg Report further alleged that "most of these sales come from . . . Quad-M[,]" which, unbeknownst to the public, Defendant "Liscouski ha[d] been serving as a . . . director [of] since August last year." Iceberg doubted that QCI would ever collect from Quad M, which "reported just $1m cash against $16.2m of liabilities due in the next 12 months."

38.    Moreover, the 2022 Iceberg Report emphasized QCI's proclivity for shifting its business focus on a dime. The 2022 Report noted that although QCI's "original intent was to focus on software alone[,]" "poor performance seemingly led management to change its mind and invest in hardware."

39.    This change in trajectory led to QCI's purchase of QPhoton, Inc. ("QPhoton"), a purported leading innovator in the quantum photonic technology space, in a highly dilutive approximately $85 million stock-for-stock deal. However,

the 2022 Iceberg Report raised questions about QCI's ability to compete in the hardware space; the 2022 Report alleged that QCI "failed to sell its software and we do not expect it to be any better at selling hardware, its latest venture." The 2022 Report noted that "[b]eyond the constant PR [press release] hype, the truth is that [QCI] is poorly capitalized and has to compete with companies with far more resources."

40.     Ultimately, Iceberg's warnings regarding the scope and nature of the Company's business would be validated by revelations in 2024 and 2025.

## B.     The Individual Defendants Cause the Company to Issue Materially Misleading Statements

41.     The Individual Defendants caused the Company to issue materially misleading statements, including:: (i) overstating the capabilities of QCI's quantum computing technologies, products, and/or services; (ii) overstating the scope and nature of QCI's relationship with NASA, and the scope and nature of its NASA-related contracts and/or subcontracts; (iii) overstating QCI's progress in developing a TFLN foundry, the scale of the foundry, and the TFLN orders QCI had received; and (iv) the fact that QCI's deals with Quad M and millionways secretly related party transactions and were not arm's-length.

42.     On March 30, 2020, Individual Defendants Liscouski, Roberts, and Velge caused QCI to report its financial and operating results for the quarter and year ended December 31, 2019 in its Form 10-K filed with SEC (the "2019 10-K"). In the 2019 10-K, which Liscouski, Roberts, and Velge signed, QCI represented its

quantum computing technology, products, and services, in the following relevant part:

> Quantum Asset Allocator: We have released our first commercial product for the FinTech, or Financial Technology, market, the Quantum Asset Allocator (QAA) . . . . QAA is available both as a cloud-based software service and as an on-premises software-plus-hardware system. Both implementations are designed to quickly return optimal or near-optimal interactive solutions and analyses of financial asset allocation problems.
>
> * * *
>
> "Mukai" quantum application development platform: The Company recently released its "Mukai" quantum application development platform. Mukai can be used to solve extremely complex optimization problems, which are at the heart of some of the most difficult computing challenges in industry and government. Its software stack enables developers to create and execute quantum-ready applications on classic computers, while being ready to run on quantum computers when those systems can achieve performance advantages . . . . The Company has already demonstrated superior performance against established computational benchmarks for some applications built on Mukai and running on classical computers.

43. The 2019 10-K was appended by signed certifications by Individual Defendants Liscouski and Roberts, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Individual Defendants Liscouski and Roberts certified that the 2019 10-K contained no materially untrue facts or omissions and that the financial information contained therein "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of [QCI] as of, and for, the periods presented in this report[.]"

44. Approximately one year later, the Individual Defendants, including Liscouski, Roberts, Velge, and Fagenson, caused QCI to file an annual report on

Form 10-K with the SEC (the "2020 10-K"), alongside appended exhibits containing substantively similar SOX certifications to those referenced in ¶43, *supra*, again signed by Individual Defendants Liscouski and Roberts. The 2020 10-K, which itself was signed by Liscouski, Roberts, Velge, and Fagenson, stated, *inter alia*:

> Qatalyst (formerly Mukai) is our answer to the current state of the quantum computing industry. As the industry's first publicly available Quantum Application Accelerator, Qatalyst enables developers to create and execute quantum-ready applications on conventional computers, while being ready to run on quantum computers where those systems achieve performance advantage. Qatalyst performs the complex problem transformations necessary to be executed on a variety of quantum platforms today, and users can call upon the same Qatalyst APIs (Application Programming Interfaces) to achieve optimization performance advantages on conventional computers using our cloud-based solution.

45.     On January 19, 2022, the Individual Defendants caused QCI to issue a press release announcing its agreement with Quad M to "provide consulting and quantum-driven solutions[.]" This release failed to disclose that Quad M was a related party, instead portraying the agreement as the manifestation of QCI's competitive quantum computing technology. The release stated, in relevant part:

> QCI will deliver health insurance underwriting applications to Quad M for optimization of its underwriting services as a subscription with a monthly fee for every employee that avails themselves of Quad M's health solution. Quad M expects to apply these applications to over 100,000 insured lives by the end of 2022.
>
> * * *
>
> This collaboration will utilize QCI's Qatalyst™ software to provide more accurate and diverse underwriting insights, leveraging quantum-ready classical, early NISQ [noisy intermediate-scale quantum], and eventually full-scale quantum computers. QCI will work with Quad

M's database of 100K employees to provide deeper insights that drive more robust underwriting solutions for Quad M. Once proven, Quad M and QCI will jointly market the product to other self-insured companies as well as medical insurance providers.

46.    On February 24, 2022, the Individual Defendants caused QCI to announce its exclusive marketing agreement with QPhoton. The accompanying press release stated, *inter alia*:

> By coupling quantum hardware technologies from QPhoton with Qatalyst, QCI will deliver more powerful solutions to accelerate the application and value from quantum computing for specific applications and markets. QPhoton technologies will also offer QCI reseller, technology and QPU [quantum processing unit] partners enhanced solutions to further accelerate the adoption of quantum computing.

> A key advantage of the Qatalyst software is that it is hardware-agnostic, supporting a variety of quantum technologies and QPUs, each with their own unique performance and computational attributes. This eliminates the need for deep, complex low-level coding and vendor lock-in required by available software alternatives.

47.    On March 15, 2022, Individual Defendants Liscouski, Roberts, Turmelle, Velge, and Fagenson caused QCI to file an annual report on Form 10-K with the SEC containing its financial and operating results for the quarter and year ended December 31, 2021 (the "2021 10-K"). Similar to the 2019 and 2020 10-Ks, *see* ¶¶42-44, *supra*, the 2021 10-K, which was signed by Liscouski, Roberts, Turmelle, Velge, and Fagenson, contained signed certifications by Individual Defendants Liscouski and Roberts.

48.    The 2021 10-K repeated QCI's previous statements about Qatalyst product, *see* ¶44, *supra*. Notably, in a section dedicated to disclosing QCI's related

15

party transactions, the 2021 10-K failed to disclose any business dealings with Quad

M. The relevant section stated:

> The following is a summary of transactions since January 1, 2019 to which we have been or will be a party in which the amount involved exceeded or will exceed $162,761 (one percent of the average of our total assets at year-end for our last two completed fiscal years) and in which any of our directors, executive officers or beneficial holders of more than 5% of any class of our capital stock, or any immediate family member of, or person sharing a household with, any of these individuals, had or will have a direct or indirect material interest, other than compensation arrangements that are described under the section captioned "Executive compensation."

> Other than as disclosed below, there have been no transactions involving the Company since the beginning of the last fiscal year, or any currently proposed transactions, in which the Company was or is to be a participant and the amount involved exceeds $120,000 or one percent of the average of the Company's total assets at year-end for the last two completed fiscal years, and in which any related person had or will have a direct or indirect material interest.

49. On May 24, 2022, the Individual Defendants caused QCI to announce

that it had "entered into a definitive agreement to acquire QPhoton." In the

corresponding press release, QCI stated that "[t]he acquisition of QPhoton extends

QCI's offerings to accelerate the accessibility of quantum computing, and other

powerful technologies, into easily deployable solutions today, and advances QCI

into a full-spectrum quantum software and hardware company." In the press release,

Individual Defendant Liscouski stated that, *inter alia*, "[t]he combination of

QPhoton's powerful quantum processing technology and systems with QCI's

Qatalyst software significantly accelerates accessibility to quantum solutions for real

business problems."

50.    On June 16, 2022, the Individual Defendants caused QCI to issue a press release announcing its completion of the QPhoton acquisition. In the corresponding press release, Individual Defendant Liscouski stated that "[t]his acquisition represents a significant leap forward in real-world usability in the quantum computing space" and would result in QCI becoming "a provider of full-stack quantum software and hardware solutions[.]"

51.    On February 8, 2023, the Individual Defendants caused QCI to issue a press release announcing "a subcontract award from SSAI [Science Systems Applications, Inc.] to support NASA in testing one of its proprietary quantum photonic systems for remote sensing applications." It stated, in relevant part:

> Under the subcontract, QCi[1] will test an existing LiDAR system designed to remotely measure the physical properties of different types of snowpacks . . . based on a recent breakthrough theory. The QCi LiDAR system could be used to indicate changes in weather patterns which have a significant impact on water reserves available both for agricultural facilities and in cities[.]
>
> * * *
>
> QCi has recently developed a variety of quantum information technology and systems, including those of entropy quantum computing, reservoir quantum computing, quantum imaging and sensing. Its quantum photonic LiDAR systems deliver new measurement capabilities with single-photon sensitivity, strong noise rejection, and high-ranging and spatial resolution.

---

[1]    QCI sometimes refers to itself as "QCi" in its press releases and investor communications.

52.    On March 30, 2023, Individual Defendants Liscouski, Roberts, Huang, Turmelle, Velge, Fagenson, and Weimer signed and caused QCI to file its annual report on Form 10-K with the SEC for the quarter and year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K contained signed SOX certifications by Individual Defendants Liscouski and Roberts.

53.    When comparing QCI's full year 2022 revenues to those in the previous fiscal year, the 2022 10-K stated, in relevant part:

> Revenues for the Twelve Months ended December 31, 2022 were $135,648 as compared with $0 for the comparable prior year period, a change of $135,648, or 100%   All revenue in the current reporting period is derived from professional services provided to multiple commercial and government customers under multi-month contracts . . . . We expect revenues to increase meaningfully in 2023 as we emphasize our hardware capability.

54.    The 2022 10-K represented the capabilities of QCI's quantum computing technology, products, and services favorably, stating, *inter alia*:

> [F]ollowing the June 2022 merger with QPhoton . . . and its associated intellectual property and engineering team, the Company is now able to provide full-stack quantum information services.

> The core of our quantum information services today is our Entropy Quantum Computing (EQC) technology. We have built room-temperature, photonic quantum information processing systems underpinned by a series of patented and patent pending technologies . . . . Our technology, supported by professional services through our "Quantum Solutions" offering, helps our clients benefit from the technology today.

55.    In the section dedicated to disclosing QCI's related party transactions, the 2022 10-K again failed to disclose QCI's dealings with Quad M.

56.    On April 27, 2023, the Individual Defendants caused QCI to issue a press release announcing its partnership with millionways. The announcement failed to disclose that millionways was in fact a related party involved with one of QCI's founders, instead implying that QCI had been chosen for the partnership due to its purportedly competitive quantum computing technology. The release stated, in relevant part:

> [QCI] . . . a first-to-market full-stack photonic-based quantum computing and solutions company, today announced the signing of a Memorandum of Understanding with AI firm millionways to demonstrate the power of [AI] when combined with [QCI]'s Reservoir Quantum Computing (RQC).

> The goal of the partnership is to explore and determine the business value of the combination of millionways' AI algorithms and QCI's existing RQC systems using audio files to produce an emotional scoring capability. If successful, the companies will develop a joint marketing and business development plan to pursue commercial opportunities.

57.    On May 23, 2023, the Individual Defendants caused QCI to issue a press release announcing that the Company had "received a follow-on task order to its subcontract award…to support NASA in remote sensing and climate change monitoring[,]" stating, in relevant part:

> In addition to testing its proprietary quantum photonic system for remote sensing applications (QLiDAR), QCi will also be processing satellite images by utilizing its photonic-based reservoir computing technology. This initial testing engagement is expected to be completed during the second quarter of 2023.

> * * *

> QCi . . . will perform both the original quantum LiDAR work as well as applying photonic computing capability to process the LiDAR data.

> This will be accomplished under a subcontract from [SSAI.] Under the
> expanded subcontract, QCi will run the data from the QLiDAR system
> through the photonic-based reservoir computer to improve the
> calculation of the level of water released from snowmelt

58. On July 13, 2023, the Individual Defendants caused QCI to issue a press release announcing that the Company had been awarded a "subcontract . . . from Bay Area Environmental Research Institute (BAERI) to build and test for NASA Ames an innovative photonic sensor instrument to provide accurate measurement of atmospheric particulates such as clouds, aerosols, smoke flume, volcanic ashes, etc., in order to identify physical properties including size, shape and chemical composition" (the "July 2023 Press Release"). Therein, QCI asserted that "[t]his award represents the third distinct task order from NASA and is the second research center within NASA to subcontract with the Company."

59. The July 2023 Press Release outlined QCI's responsibilities pursuant to the subcontract as follows:

> Under the nine-month subcontract, QCi will deliver a compact system,
> programmed to process a substantial amount of data that can support
> standalone operations for days, and designed to be powered by a 12-
> volt battery that consumes no more than 30 watts of power. In addition,
> QCi will generate reports that will detail the operation of the system in
> a realistic environment, provide the range of parameters and offer
> predictive analyses on future enhancements with a possible long-term
> objective to position these instruments for field deployment to create a
> monitoring network.

60. On September 21, 2023, the Individual Defendants caused QCI to issue a press release announcing that it had selected a five-acre site in the ASU Research Park for a "Quantum Photonic Chip Foundry" for the production of TFLN chips.

QCI stated that, *inter alia*: (i) "[t]he location QCI chose for its new facility is on five acres within the extensive 320-acre research park hosted by ASU;" and (ii) "QCI anticipates that its chip manufacturing will commence operations first half of 2024 . . . and mass-produc[e] quantum photonics chips with complex nanophotonic circuits by late 2024 / early 2025."

61.     On February 14, 2024, the Individual Defendants caused QCI to issue a press release announcing that the Company had "been awarded a fourth project from NASA[.]" Therein, QCI stated, in relevant part:

> QCi, the only company worldwide that can utilize Entropy Quantum Computing (EQC) to denoise LiDAR spectral information, has been tapped by Analytical Mechanics Associates on behalf of NASA to provide a new approach to remove sunlight noise from LiDAR spectral mapping in lower earth orbit.
>
> * * *
>
> NASA's continued engagement with QCi fosters a partnership for leveraging QCi's innovation in photonics.

62.     On April 1, 2024, the Individual Defendants caused QCI to file its annual report on Form 10-K, signed by Liscouski, McGann, Boehmler, Huang, Turmelle, Fagenson, and Weimer, with the SEC for the quarter and year ended December 31, 2023 (the "2023 10-K"). The 2023 10-K contained SOX certifications signed by Individual Defendants McGann and Boehmler.

63.     The 2023 10-K compared QCI's full year 2023 revenues with the corresponding 2022 metric, stating, in relevant part:

Revenues for the year ended December 31, 2023 were $358,047 compared to $135,648 for the year ended December 31, 2022, an increase of $222,399, or 164%. Revenue was derived from sales of hardware products and professional services in 2023, and solely from professional services in 2022, in each case provided to multiple commercial and government customers under multi-month contracts . . . . We expect revenues to increase meaningfully in 2024 as we continue to emphasize our hardware capability.

64.     The 2023 10-K represented QCI's quantum computing technology, products and services, stating, *inter alia*:

QCi's core technology is Entropy Quantum Computing ("EQC"). EQC is a patent pending methodology that utilizes the environment to drive controlled energy loss in a photonic architecture....This methodology allows for very low power consumption and room temperature operation. Also, due to the nature of the measurement and feedback process, EQC drives non-linear quantum interactions for "dense, fully connected" problem solving.

\* \* \*

In addition to our photonic computing platform, we have leveraged QCi's core technology to demonstrate powerful quantum sensing use cases in LIDAR (Light Detection and Ranging), reservoir computing (a form of neural network that can be used in machine learning applications) and quantum cyber authentication (a method for highly secure communication within a network).

65.     Furthermore, in the 2023 10-K's section dedicated to the disclosure of QCI's related party transaction, the Company failed to disclose its business dealings with both Quad M and millionways.

66.     On September 11, 2024, the Individual Defendants caused QCI to file an amendment to its 2023 10-K on Form 10-K/A with the SEC (the "2023 10-K/A").

The 2023 10-K/A "restate[d] [QCI's] consolidated financial statements, including the notes thereto, for the years ended December 31, 2023 and 2022[.]"

67.    Further, the 2023 10-K/A "replace[d] the Report of Independent Registered Public Accounting Firm prepared by BF Borgers CPA PC ('BF Borgers') included in the [2023 10-K] with the Report of Independent Registered Public Accounting Firm from BPM LLP ('BPM')" after the SEC had "suspend[ed] BF Borgers from appearing and practicing as an accountant before the SEC and" QCI had "subsequent[ly] ret[ained] . . . BPM to replace BF Borgers[.]" The 2023 10-K/A also contained SOX certifications, signed by Individual Defendants McGann and Boehmler.

68.    The 2023 10-K/A discussed QCI's revenues for full year 2023 as compared to full year 2022, stating, in relevant part:

> Revenues for the year ended December 31, 2023, were $358 thousand compared to $136 thousand for the year ended December 31, 2022, an increase of $222 thousand, or 163%. Revenue was derived from sales of hardware products and professional services in 2023, and solely from professional services in 2022. In each year, services were provided to multiple commercial and government customers under multi-month contracts . . . . We expect revenues to increase meaningfully in the coming years as we continue to emphasize our hardware capability.

69.    On October 17, 2024, the Individual Defendants caused QCI to issue a press release announcing that it had "been awarded a fifth project from [NASA] to develop quantum remote sensing technology that would significantly lower the cost of spaceborne LIDAR imaging and advance scientific understanding of the mechanisms of climate change." The press release also stated, *inter alia*:

This is a continuation of a long-standing strategic partnership between NASA and QCi aimed at creating a radically different approach to LiDAR technology for atmospheric remote sensing measurements. The proposed approach, which is currently being developed by QCi, would significantly lower the cost of LIDAR missions, thereby allowing NASA to undertake more frequent flights to better understand the causes of climate change. The recently awarded contract is an important milestone in further assessing viability of QCi's technology.

70.     On October 22, 2024, the Individual Defendants caused QCI to issue a press release announcing that it had "reached the final stage of commissioning its quantum photonic chip foundry in Tempe, Arizona" and that "[t]he QCi Foundry has moved into its final phase of construction and capital equipment installation, with an anticipated grand opening set for Q1 2025."

71.     On November 1, 2024, the Board, comprised of defendants Liscouski, Huang, Weimer, Shabani, Fagenson, and Turmelle, caused QCI to issue a definitive proxy statement soliciting stockholder votes in advance of the special meeting to be held December 10, 2024 (the "2024 Proxy"). These six Individual Defendants solicited stockholder votes in favor of five management proposals, including the election of Huang, Weimer, Shabani, Fagenson, and Turmelle to new terms as directors through the 2025 annual meeting, ratification of BPM as the Company's independent auditor, and the approval of issuance of 20% or more of common stock upon the conversion of a certain note.  The 2024 Proxy incorporated the Company's 2023 10-K and  10-K/A by reference.

72.     The 2024 Proxy concealed that the disclosures alleged above in the 2023 10-K and 10-K/A falsely misrepresented the Company's business and results.

24

73.    The 2024 Proxy falsely stated:

**TRANSACTIONS WITH RELATED PERSONS**

There have been no transactions involving the Company since the beginning of its last fiscal year, or any currently proposed transactions, in which the Company was or is to be a participant and the amount involved exceeds $120,000 and in which any of our directors, executive officers or beneficial holders of more than 5% of any class of our capital stock, or any immediate family member of, or person sharing a household with, any of these individuals, had or will have a direct or indirect material interest, other than compensation arrangements that are described under the section captioned "*Executive Compensation.*"

74.    Regarding the Board proposal to ratify appointment of BPM as independent auditor, the 2024 Proxy concealed that BF Borgers had participated in the wrongdoing and fraud alleged herein, and instead disclosed:

During the fiscal years ended December 31, 2023 and 2022, and the subsequent interim period through the date of the Company's dismissal of BF Borgers, there were no disagreements, as that term is defined in Item 304(a)(1)(iv) of Regulation S-K, between the Company and BF Borgers on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to BF Borgers' satisfaction, would have caused BF Borgers to make reference to such disagreements in its audit reports.

During the fiscal years ended December 31, 2023 and 2022, and the subsequent interim period through the date of this report, there were no reportable events within the meaning of Item 304(a)(1)(v) of Regulation S-K.

The SEC has advised that, in lieu of obtaining a letter from BF Borgers stating whether or not it agrees with the statements herein, the Company may indicate that BF Borgers is not currently permitted to appear or practice before the SEC for reasons described in the SEC's Order Instituting Public Administrative and Cease-and-Desist Proceedings Pursuant to Section 8A of the Securities Act of 1933, Sections 4C and 21C of the Exchange Act and Rule 102(e) of SEC's Rules of Practice,

Making Findings, and Imposing Remedial Sanctions and a Cease-and-Desist Order, dated May 3, 2024.

75.     Regarding the Board proposal to approve the issuance of 20% or more of common stock, the 2024 Proxy disclosed that this was necessary due to a Secured Promissory Note entered with Streeterville Capital, LLC ("Streeterville").  The 2024 Proxy failed to disclose that the principal of Streeterville is John M. Fife ("Fife"). Fife has a notable history of stock fraud.  In an April 2024 filing related to one of his past transactions, the SEC referred to Fife as "a recidivist violator of federal securities laws," due to charges against him dating back to 2007 and claimed that he "manipulat[ed] the stock of microcap companies (such as NRx) for profit."

76.     The 2024 Proxy was therefore materially misleading in that it: (i) incorporated by reference false public disclosures and financial statements; (ii) concealed related party transactions; (iii) concealed that the previous independent auditor had participated in the fraud alleged herein; and (iv) solicited shareholder votes for the issuance of stock to a known microcap stock manipulator.

77.     On November 20, 2024, the Individual Defendants caused QCI to issue a press release announcing that the Company had "received its second purchase order for its [TFLN] photonic chip foundry[,]" stating, *inter alia*:

> The order will support the research efforts of a U.S.-based university and is part of the QCi Foundry's pilot launch program, with fulfillment expected in Q1 2025.
>
> The order will enable the university to advance chip-scale acoustic and cross-domain microsystems, utilizing the scalable industrial processes

provided by the QCi Foundry. As part of this order, QCi will leverage its standard TFLN processing recipes to facilitate a custom fabrication run tailored to the needs of the university. This collaboration lays the groundwork for further expanding the use of TFLN into applications that extend into micro electromechanical systems, further establishing TFLN's potential as a versatile material system and a key enabler for the next-generation photonics market and beyond.

78.    The statements referenced in ¶¶49-77 were materially false and misleading because the Individual Defendants caused QCI to make false and/or misleading statements that failed to disclose material adverse information regarding QCI's business and operations.

## C.    The Truth Begins to Emerge and Defendants Continue to Mislead

79.    The truth began to emerge during intraday trading on November 27, 2024. On that day, Iceberg published a report (the "November 2024 Iceberg Report") alleging that the Company's press releases concerning its TFLN foundry and related purchase orders were false.

80.    The November 2024 Iceberg Report stated the following regarding the purchase order announced in the QCI press released described in ¶68, *supra*:

**The University of Texas pours cold water on [QCI]'s press release**

[QCI] announced two purchase orders for its [TFLN] chips in November 2024. One with an unnamed "research and technology institute based in Asia" and the second with a "US-based university".

Originally, the company disclosed the name of the US-based university – The University of Texas at Austin. But [QCI] removed all references to the university yesterday.

The university was likely unhappy with the representations in the release and being involuntarily part of this PR stunt. We spoke to a university professor who confirmed two things:

- Only a small order had been placed; and

- The individual in charge of the order was surprised to see the [QCI] announcement, as it was not reviewed prior to release.

81.    The November 2024 Iceberg Report also stated the following, in relevant part, regarding QCI's TFLN foundry:

[QCI] claims to have a foundry located at 2050 E ASU Circle Suite 107 Tempe AZ 85284 – a leased space within [ASU]'s Research Park. The facility is intended to fulfil the company's announced purchase orders for TFLN chips, with production expected to begin in 1Q25, indicating that the facility is nearly ready.

* * *

When reached by phone, building management very confidently said there was no foundry at this address. Then an investigator was sent to have a look around the area in search of this mysterious foundry. The investigator came back with the following observations and findings:

- People walking around outside said this was an office building. There are no loading docks (that have an elevated space to facilitate loading) or very large doors. There would be no way to get very large machines inside, which you would expect for a chip foundry about to start "mass production".

- [QCI] was a tenant. But all the investigator saw was some people in a conference room.

From the outside, the buildings do not look suitable for a foundry, which needs high ceilings and open spaces for heavy equipment, and proper ventilation for handling fumes in an environment highly sensitive to contamination. None of these seem to exist.

Other tenants at the same address include IT staffing firm Experis and cloud-based content services platform VisualVault – all of a non-industrial nature.

28

An old floor plan of a neighbouring identical single-story facility (2030 E. ASU Circle) shows multiple rooms, hallways, and specific spaces like restrooms, but there is no clear indication of spaces for industrial equipment.

82. The November 2024 Iceberg Report further revealed that, despite the Company's claim that it had secured a five-acre site in the ASU Research Park for its TFLN foundry, "the entire . . . 2050 building is barely more than an acre, let alone Suite 107 in the building" and, "[a]t that time, production was supposed to start in the first half of 2024." Indeed, Iceberg concluded that QCI's "fixed asset breakdown does not align with the level of investment one might expect to establish a foundry."

83. On December 9, 2024, Iceberg published a subsequent report regarding QCI (the "December 2024 Iceberg Report"). Therein, Iceberg revealed that, *inter alia*:

> [QCI] has shared photos online of what it claims to be its foundry. But this setup looks more like a laboratory. This is a far cry from a foundry ready for "mass production" on what [QCI] said would be "five acres within the extensive 320-acre research park hosted by ASU". Throwing together some equipment does not make an operational TFLN-chip foundry. [QCI] has already experienced delays compared to its initial production schedule. Many other companies would already be manufacturing TFLN devices, if creating such a facility were this straightforward.

> * * *

> From 2021 to 9M24, the company reported insignificant levels of revenue, despite various claims, such as being a NASA sub-contractor. The company has kept recording losses.

84. Following the publication of the December 2024 Iceberg Report, QCI's stock price fell $0.46 per share, or 5.8%, to close at $7.47 per share on December 9,

2024. However, in spite of the December 2024 Iceberg Report, QCI's securities continued trading at artificially inflated prices due to the Individual Defendants' continued misstatements and omissions.

85.     On December 12, 2024, the Company filed a Form 8-K with the SEC, disclosing the results from the votes on the proposals contained the 2024 Proxy. In particular, all Board proposals were approved. The misleading disclosures in the 2024 Proxy were fundamental to the shareholder approval of the 2024 Proxy's proposals. As a result of the misleading statements and omissions, the Company was harmed.

86.     On December 17, 2024, the Individual Defendants caused QCI to issue just such a misleading press release, announcing that the Company had "been awarded a prime contract by [NASA] Goddard Space Flight Center[.]" Therein, QCI stated, in relevant part:

> This contract marks a pivotal step forward for QCi by applying its entropy quantum optimization machine, Dirac-3, to support NASA's advanced imaging and data processing demands.
>
> The contract will apply Dirac-3 to address the challenging phase unwrapping problem for optimally reconstructing images and extracting information from interferometric data generated by radar.
>
> QCi will support NASA in its mission to unwrap interferograms at full scale, ultimately enhancing their data quality and accuracy.

87.     These statements were materially false and misleading because the Individual Defendants failed to disclose material adverse facts regarding: (i) QCI's

quantum computing technology, products, and/or services; and (ii) the scope and nature of QCI's relationship with NASA.

### D. The Truth Fully Emerges: The Capybara Report

88.     The truth fully emerged on January 16, 2025, when Capybara published a report alleging that QCI was "a rampant fraud" (the "Capybara Report"). Capybara noted that "[f]rom inception, the company has defrauded investors by fabricating revenue, misrepresenting their products, and issuing a steady stream of false press releases." In fact, Capybara continued that, in order to conceal their fraud, the Individual Defendants caused QCI to "even include[] a clause in employee separation agreements prohibiting them from talking to the SEC."

89.     The Capybara Report also included testimony from former QCI personnel alleging that the Company had misrepresented the true capabilities of its technology, products, and services. For example, the Capybara Report quoted a former employee who alleged that QCI "insinuated that there were products that were farther along than they were, to lead the public to believe they had quantum capabilities that they didn't and products that were in customers hands when they weren't."

90.     The Capybara Report went further, in quoting a former QCI executive who stated:

> [It] would take a small army quite some time to make what they currently have work or be a viable product. There's been no evidence from the company. There's been no progress. They haven't even

entered the game. No validation that they can run with any interesting results. Until they do that it's just a glorified University project.

91.    Moreover, the Capybara Report included testimony from a number of QCI employees, associate, contractors, and partners indicating that the Individual Defendants caused QCI to pump up its stock price through false and misleading press releases. Specifically, the Capybara Report stated:

> Former employees and people associated with [QCI] say it was common knowledge among employees that the CEO was doing anything he could to pump the share price, including issuing false press releases that lied about their products, revenue deals, and partnerships.
>
> •    [QCI] claims to have a "longstanding relationship" with NASA, but NASA personnel and government contract records confirm this is false.
>
> •    [QCI] has a single contract with NASA, valued at $26,000. The contract was for generic "computer programming" and [QCI] was the sole bidder.
>
> •    [QCI] falsely claims to have won two contracts directly with NASA and at least 4 subcontracts "awarded by NASA".
>
> •    NASA confirmed to us that they have no relationship with [QCI] beyond the single $26,000 "computer programming" contract noted above.
>
> •    We spoke with NASA and the prime contractors named in [QCI]'s PRs and we found that all the PRs are deliberately misleading or include outright lies.
>
> •    The evidence suggests that [QCI] bids on low-value, NASA-related contracts for the sole purpose of pumping their stock via misleading press releases.
>
> •    In several cases, [QCI] bid on small subcontracts from companies that do work with NASA. In each case, the prime contractor confirmed that [QCI] was the sole bidder and the contracts were for

32

small amounts. NASA confirmed that they played no role in the issuing of the subcontracts.

•      [QCI] promoted each of these subcontracts as significant and related to quantum computing. In reality, the contracts were very small, unrelated to quantum computing, and were awarded to [QCI] because they were the only bidder.

•      In a transparent attempt to hide their fraud, [QCI] recently removed some false and misleading PRs from their website.

92.    Additionally, the Capybara Report took issue with QCI's purported

revenues from the fake and related party transactions with Quad M and millionways.

Capybara wrote, in relevant part:

For years [QCI] has struggled to generate revenue because of their lack of real products. [QCI]'s solution to this problem was to sign fake deals with undisclosed related parties. The sole purpose for these deals was to deceive investors through promotional press releases containing outright lies.

•      [QCI] is currently being sued by a former partner for breach of contract and fraud. The plaintiff claims [QCI]'s first three revenue deals were completely fake and that [QCI] never even sent invoices for the deals.

•      One of these deals was with Millionways Inc, a purported AI company. Undisclosed to investors, Millionways Inc was a related party. One of [QCI]'s founders was involved with Millionways.

•      [QCI] later announced a LOI [letter of intent] to acquire Millionways. As part of the deal, [QCI] paid Millionways $500k via an unsecured note. The deal was never completed and [QCI] has been quietly marking down the value of the note because they will never be paid back.

•      In 2022, [QCI] announced a deal with Quad M Solutions Inc, an OTC listed company with ties to multiple stock frauds.

•      Undisclosed to investors, Quad M was a related party. [QCI]'s CEO served as a director of Quad M and the co-founders of [QCI] were

deeply involved in Quad M and are long-time business associates of Quad M insiders and investors.

• In 2022, [QCI] signed an MOU [memorandum of understanding] with Quad M claiming that they would generate 5-10 dollars per employee per month for [QCI]. Unsurprisingly, the deal never materialized and generated no revenue.

93. Finally, the Capybara Report echoed the analysis of the various Iceberg reports regarding QCI's misrepresentation of its progress in and the scale of its TFLN foundry. Capybara's analysis was even more damning, however; it alleged that QCI had never actually purchased the five-acre parcel of land at the ASU Research Park for its TFLN foundry. Indeed, citing ASU Research Park Management, Capybara wrote, in relevant part:

• In Sep. 2023 [QCI] claimed to have chosen a site for their new fab, a 5-acre plot in the ASU Research Park. Park management confirmed that [QCI] inquired about the 5-acre parcel but never followed up and never attempted to purchase the property. Now, more than a year after [QCI]'s announcement, the 5-acre parcel remains empty, and it still belongs to the orignal [sic] owner.

• In Oct. 2024, [QCI] claimed to have opened the foundry they announced in September the prior year. However, the company didn't open a fully operational foundry, instead they opened a small R&D [research and development] lab in a leased office space.

• [QCI]'s R&D lab is in an office building not suitable for industrial use cases.

• [QCI]'s R&D space does not have a cleanroom, which is required to produce commercial quality TFLN chips.

94. On the publication of the Capybara Report, QCI's stock price fell $1.72 per share, or 14.89%, over the following two trading sessions, to close at $9.83 per share on January 17, 2025.

## VI.    DAMAGES TO THE COMPANY

95.    As a direct and proximate result of the Individual Defendants' conduct, QCI has been seriously harmed and will continue to be. Such harm includes, but is not limited to:

a.    Any funds paid to settle the Securities Class Action;

b.    Costs incurred from compensation and benefits paid to the Defendants who have breached their duties to QCI;

c.    Funds diverted to insiders through concealed and improper related party transactions; and

d.    Loss of market capital due to the wrongdoing alleged herein.

96.    In addition, QCI's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The Company still has not fully admitted the nature of its false statements and the true condition of its business.  The credibility and motives of management are now in serious doubt.

97.    The actions complained of herein have irreparably damaged QCI's corporate image and goodwill.  For at least the foreseeable future, QCI will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that QCI's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## VII.  DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

98.    Plaintiff brings this action derivatively in the right and for the benefit of QCI to redress injuries suffered, and to be suffered, by QCI as a direct result of the wrongdoing alleged herein.  QCI is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

99.    Plaintiff will adequately and fairly represent the interests of QCI in enforcing and prosecuting its rights.

100.   Plaintiff has continuously been a shareholder of QCI at times relevant to the wrongdoing complained of and is a current QCI shareholder.

101.   When this action was filed, QCI's Board of Directors consisted of six directors, defendants Huang, Fagenson, Turmelle, Weimer, and Shabani, as well as non-party Eric Schwartz. Plaintiff did not make any demand on the Board to institute this action because such a demand would be a futile, wasteful, and useless act, as set forth below.

102.   Defendant Huang could not disinterestedly and independently consider a demand for action.  The Company's proxy statements concede that Huang is not disinterested and he as an employee of the Company.  Moreover, Huang is one of the primary issuers of the misleading statements alleged above that are the subject of the Securities Class Action.  He also was a party to the concealed related party transactions alleged herein.  For these reasons, Huang faces a substantial likelihood

36

of liability and also is not disinterested of the Company's defense(s) in the securities class action. As a result, demand as to Huang is futile.

103. Defendants Huang, Turmelle, Fagenson, and Weimer unanimously approved the acquisition of millionways in May 2023. According to a press release issued by the Company on May 22, 2023, "[QCI] today announced that its Board of Directors has unanimously approved the signing of a non-binding Letter of Intent (LOI) to acquire up to 100% of the AI firm, millionways." The press release nowhere disclosed that millionways was a related party, nor did the Company's proxy statement issued by the same defendants on September 23, 2023 disclose that millionways was a related party. At the time, Fagenson and Turmelle were members of the Audit Committee and were specifically charged with reviewing and approving all related party transactions and "potential conflict of interest transactions." As a result, there exists reason to doubt that Huang, Turmelle, Fagenson, and Weimer could disinterestedly and independently consider a demand for action because such demand would require them to investigate their own wrongs and omissions. Huang, Turmelle, Fagenson, and Weimer each face a substantial likelihood of liability and also are not disinterested of the Company's defense in the securities class action. Demand is futile on this basis as to Huang, Turmelle, Fagenson, and Weimer.

104. During the wrongdoing alleged herein, the Board's Audit Committee was comprised of Fagenson, Turmelle, and since mid-2023, Weimer. These three

defendants could not disinterestedly and independently consider a demand for action in connection with the allegations herein for at least the following reasons.

105.   First, the Audit Committee charter provides that the committee "shall… [c]onduct an appropriate review of and approve all related party transactions on an ongoing basis and the Committee shall review potential conflict of interest situations where appropriate."  One of two inferences are reasonable based on the allegations herein, either of which excuses demand: either Turmelle, Fagenson, and Weimer knew of the undisclosed related party transactions and conflicts of interest detailed herein and allowed their concealment, including in proxy statements containing Audit Committee reports signed by them, or they breached their fiduciary duties by knowingly failing to review and approve the transactions.

106.   Second, the Audit Committee charter required Turmelle, Fagenson, and Weimer to review the Company's financial statements prior to distribution, to consult with management and the auditor and consider the adequacy of the Company's reporting processes and controls, and to review any reports raising material issues regarding the Company's accounting:

III.    Audit Committee Responsibilities and Duties

Review Procedures

A.    Review the Company's annual audited financial statements prior to distribution. Review should include discussion with management and independent auditors of significant issues regarding accounting principles, practices, and judgments.

38

B.    In consultation with the management, the independent auditors, and the Company's principal accounting officer, consider the integrity of the Company's financial reporting processes and controls, including any major issues as to the adequacy of the Company's internal controls, and any special steps adopted in light of any identified material control deficiencies. Discuss significant financial risk exposures and the steps management has taken to monitor, control, and report such exposures. Review significant findings prepared by the independent auditors and the Company's principal accounting officer together with management's responses.

C.    The Committee shall review with the management and the independent auditors any correspondence with regulators and any published reports that raise material issues regarding the Company's accounting policies.

107. As alleged herein, Turmelle, Fagenson, and Weimer either knew of the undisclosed related party transactions and conflicts of interest detailed herein and allowed their concealment, including in proxy statements containing Audit Committee reports signed by them, or they breached their fiduciary duties by knowingly failing to review and approve the transactions.  Demand is therefore excused as to them on this basis as well.

108. Demand is additionally excused as to Huang, Turmelle, Fagenson, Weimer, and Shabani because they personally signed the misleading Forms 10-K and therefore personally issued the misleading disclosures that are subjecting the Company to liability in the Securities Class Action, and that perpetuated the scheme alleged herein.  Huang, Turmelle, Fagenson, Weimer, and Shabani could not disinterestedly and independently consider a demand to investigate their own mind state the misleading statements issued personally by them.

109.   Demand is likewise futile as to McGann, Liscouski, Boehmler, and Roberts, each of whom is personally named in the Securities Class Action and thus each of whom faces a substantial likelihood of liability and is not disinterested as respect to the Company's defense(s) in the securities class action.   As a result, demand as to McGann, Liscouski, Boehmler, and Roberts is futile.

## COUNT I

**(Against the Individual Defendants for Breach of Fiduciary Duty)**

110.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

111.   The Individual Defendants each owe and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of QCI's business and affairs, particularly with respect to issues as fundamental as public disclosures.

112.   The conduct by the Individual Defendants set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of QCI.

113.   In breach of their fiduciary duties owed to QCI, the Individual Defendants willfully participated in and caused the Company to expend

unnecessarily its corporate funds, rendering them personally liable to the Company for breaching their fiduciary duties.

114.   In particular, the Individual Defendants knowingly or recklessly made untrue statements and/or permitted the Company's public filings, disclosures, and statements to misleadingly report the Company's overall prospects.

115.   As a direct and proximate result of the breaches of their fiduciary obligations by the Individual Defendants, QCI has sustained and continues to sustain significant damages, including direct monetary damages, exposure to liability from securities litigation and a loss of goodwill in the capital markets. As a result of the misconduct alleged herein, Defendants are liable to the Company.

## COUNT II

### (Against the Individual Defendants for Waste)

116.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

117.   By their wrongdoing alleged above, the Individual Defendants caused QCI to exchange corporate assets for consideration so disproportionately small as to be beyond the range at which any reasonable person would be willing to trade. The agreements entered with various secretly related parties were not arm's-length and were effectively gifts to those entities.

118.   The Individual Defendants either did not inform themselves as to the terms and relationships between the related entities or willingly concealed that the

entities were related and that the terms of all such agreements were not arm's-length. As a result, not only was no substantial consideration received by the Company, but the Individual Defendants decision to enter the agreements under these circumstances was not made in good faith.

119.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

120.   Plaintiff, on behalf of QCI, has no adequate remedy at law

## COUNT III

**(Against the Individual Defendants for Unjust Enrichment)**

121.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

122.    By their wrongful acts, the Individual Defendants were unjustly enriched at the expense of and to the detriment of QCI.  The Individual Defendants were unjustly enriched as a result of the hundreds of thousands or millions of dollars' worth in compensation paid to them without basis and while they were breaching fiduciary duties owed to QCI.

123.    Plaintiff, as a stockholder and representative of QCI, seeks restitution from the Individual Defendants and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

124.    Plaintiff has no adequate remedy at law.

## COUNT IV

**(Against Defendants Liscouski, Huang, Weimer, Shabani, Fagenson, and Turmelle for Violations of Section 14(a) of the Exchange Act)**

125.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

126.    Rule 14a-9, promulgated pursuant to §14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which,

43

at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9. Specifically, the Company's proxy statement filed on November 1, 2024 violated §14(a) and Rule 14a-9 because it solicited stockholder approval to reelect Huang, Weimer, Shabani, Fagenson, and Turmelle as directors, ratify the appointment of BPM, and to approve the issuance of stock.

127.   Defendants knew or recklessly failed to know that the statements contained in the 2024 Proxy were materially false and misleading.

128.   The misrepresentations and omissions in the 2024 Proxy were material to Company shareholders in voting on the 2024 Proxy. The 2024 Proxy solicited stockholder votes for: (i) director election; (ii) ratification of the independent accounting firm; and (iii) approval of the stock issuance, among other things. The 2024 Proxy was an essential link in the accomplishment of the continuation of defendants' continued violation of their fiduciary duties and in the issuance of the new stock.

129.   The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## COUNT V

### (Against the Individual Defendants for Fraud)

44

130.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

131.    To induce QCI to enter into the agreements with millionways and Quad M, the Individual Defendants concealed that millionways and Quad M were secretly controlled and/or managed by certain of Individual Defendants.

132.    This was false. As alleged herein, millionways and Quad M were controlled by certain of Individual Defendants and were related parties.

133.    The Individual Defendants knew or should have known that millionways and Quad M were related parties.

134.    QCI relied to its detriment on the Individual Defendants' omissions by, among other things, entering into the agreements with millionways and Quad M at all and on terms which it would not have done if QCI had known the truth that millionways and Quad M were related parties.

135.    QCI was injured by its reliance on the Individual Defendants' misrepresentations and omissions, because in reality millionways and Quad M were related parties and the terms of the agreements were not what QCI could have obtained in an arm's-length transaction.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of QCI, demands judgement as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of QCI and that Plaintiff is an adequate representative of the Company;

B.      Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Defendants' breaches of fiduciary duties, waste of corporate assets, unjust enrichment, and violations of Section 14(a) of the Exchange Act;

C.      Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to QCI;

D.      Directing QCI to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect QCI and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote, resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote of the following corporate governance policies:

1.      a proposal to strengthen the Company's controls over accounting and financial reporting;

2.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

3.      a proposal to strengthen QCI's oversight of its disclosure procedures;

46

4.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

5.      a proposal to strengthen Board oversight and supervision of [Company name]'s business [and pricing] practices;

6.      a proposal to strengthen Board oversight of the Company's acquisition targets;

7.      a proposal to strengthen [Company's] disclosure controls to ensure material information is adequately and timely disclosed to the SEC and the public;

8.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

9.      a provision to promptly identify and control insider selling and conflicts of interest;

10.      a provision to permit the stockholders of [Company] to nominate at least three candidates for election to the Board;

11.      a proposal to appoint additional independent board members with established reputations in the IT industry and with substantial experience in governance, risk, compliance and cybersecurity issues; a proposal to

enhance and/or augment the audit, risk and compliance committees of the Board to oversee internal controls and compliance processes;

12.    a proposal to create the role(s) of Chief Compliance, Chief Risk Officer and/or Chief Legal Officer and to assure that the Chief Compliance, Chief Risk Officer and/or Chief Legal Officer and other company leadership have (a) necessary subject matter and regulatory expertise; (b) direct reporting authority to the Board; and (c) adequate autonomy and resources to carry out their responsibilities;

13.    a proposal to review and implement revised codes of conduct, policies and procedures, training, integrity hotlines, auditing and monitoring processes and procedures;

14.    a proposal to review and implement policies and procedures for escalating internal and regulatory issues internally and to the Board;

15.    a proposal to review and implement the confidential reporting structure and investigative process of complaints within the company; and

16.    a proposal to enhance security and cybersecurity around data privacy and system security; and

17.    a proposal to review and implement policies and procedures for programs and decisions regarding stock repurchases;

18.    a provision to permit the stockholders of QCI to nominate at least three candidates for election to the Board;

48

E.      Extraordinary equitable and/or injunctive relief as permitted by law, equity, and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on, or otherwise restricting the proceeds of Defendants' trading activities or their other assets so as to assure that Plaintiff on behalf of QCI has an effective remedy;

F.      Awarding QCI restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits, and other compensation obtained by the Defendants;

G.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

H.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

DATED: June 19, 2025

By: s/*Serina M. Vash*
**HERMAN JONES LLP**
**Serina M. Vash**

Serina M. Vash
(NJ Bar No. 041142009)
153 Central Avenue #131
Westfield, NJ 07090
Telephone: (404) 504-6516
Facsimile: (404) 504-6501
vash@hermanjones.com

**GLANCY PRONGAY & MURRAY LLP**
Telephone: (404) 504-6516
Facsimile: (404) 504-6501
Benjamin I. Sachs-Michaels
745 Fifth Avenue, Fifth Floor
New York, New York 10151
Telephone: (212) 935-7400
E-mail: bsachsmichaels@glancylaw.com

-and-

Pavithra Rajesh
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Email: prajesh@glancylaw.com

*Counsel for Plaintiff Helen Wong*